IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| **TAIWAN DICKERSON, KIM KING-MACON, and TIFFANY RUSSELL,**<br><br>Plaintiffs,<br><br>vs.<br><br>**CENTENE MANAGEMENT COMPANY, LLC, and CENTENE CORPORATION,**<br><br>Defendants. | Case No. 4:22-cv-00519-HEA |

## STATEMENT OF UNCONTROVERTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 7-4.01(E) of this Court, Defendants Centene Management Company, LLC ("CMC"), and Centene Corporation, (collectively, "Defendants") respectfully submit the following statement of Uncontroverted Material Facts in Support of their Motion for Summary Judgment.

**A.     Centene Management Co., LLC and Centene Corporation**

1.     Centene Corporation did not employ Plaintiffs Taiwan Dickerson ("Dickerson"), Kim King-Macon ("King-Macon"), or Tiffany Russell ("Russell") (collectively "Plaintiffs"); rather, CMC employed Plaintiffs. (Defendant Centene Corporation's Verified Response to Plaintiffs' First Set of Interrogatories and Requests for Production attached as **Ex. A**, at No. 17).[1]

**B.     Background on Arkansas Total Care Health Operations and Care Coordinators**

2.     The Arkansas Total Care, Inc. ("ARTC") health plan is a unique Arkansas program (Provider-led Arkansas Shared Savings Entity or "PASSE") that provides whole health solutions to Arkansas Medicaid beneficiaries ("members") with intellectual and developmental disabilities and behavioral health needs. (ECF No. 39, Declaration of Lauren Grounds In Support of Defendants' Opposition to Plaintiffs' Motion for Conditional Certification ("Grounds Decl.") at ¶ 3).

---

[1] All exhibits referenced are attached to the Declaration of Breanne Martell, attached to this Statement of Uncontroverted Material Facts in Support of Defendants' Motion for Summary Judgment.

4866-4918-5452.4 / 095402-1034

3.      Plaintiffs' non-exempt Care Coordinator position was created specifically for the ARTC PASSE program because of their unique responsibilities under ARTC's contract with the Arkansas Department of Human Services, which include coordinating services and meeting face-to-face with members at their homes to evaluate their individual needs. (Grounds Decl. at ¶ 4).

4.      During the relevant period, at any specific time there were between approximately 150 and 300 Care Coordinators in ARTC, with supervisors usually each assigned approximately 15 to 25 Care Coordinators. (Grounds Decl. at ¶ 8).

5.      For most of 2019, Care Coordinators located in the central Arkansas region were required to come into the office if they were not visiting members, but Care Coordinators who were serving members in more distant regions were able to work remotely. (Grounds Decl. at ¶ 9).

6.      Starting in late 2019 and through March 2020, Care Coordinators were allowed to work remotely, unless they were new hires or needed closer monitoring for performance issues. Many did not report to the office except for occasional meetings and training. (Grounds Decl. at ¶ 10).

7.      During the COVID-19 pandemic (approximately March 16, 2020 until April 2021), Care Coordinators worked entirely remotely and performed visits and attended meetings via video conference, without any travel. (Grounds Decl. at ¶ 11).

8.      Between April and July 2021, Care Coordinators had the option of retuning to in-person visits. (Grounds Decl. at ¶ 12).

9.      Effective July 1, 2021, returning to the field for in-person visits became mandatory. (Grounds Decl. at ¶ 13).

10.     Care Coordinators are now considered field staff and not expected to come to an office (even team meetings are held virtually), though they can work in the office if needed. (Grounds Decl. at ¶ 14).

11.     Before April 2020, ARTC's normal business hours were Monday through Friday 8 a.m. to 5 p.m., but then ARTC adopted a flexible scheduling policy that extended regular business hours to Monday through Saturday 8 a.m. to 7 p.m., with employees expected to work a 40-hour schedule each week at their discretion as long as they complete their duties and clock in and out accurately to record all time worked.

2

(Grounds Decl. at ¶ 15).

### C. CMC's Timekeeping Policies

12. The Employee Handbook provides written policies requiring non-exempt employees to accurately record the time they work each day and, when they receive their paychecks, to verify immediately that their working time was recorded accurately and that they were paid correctly for all hours worked and to report discrepancies immediately to payroll. (Grounds Decl. at ¶ 16).

13. The Handbook also states it is "a violation of the Company's policy for anyone to instruct or encourage another employee to work off the clock, to incorrectly report hours worked, or to alter another employee's time records," and instructs employees to report any violations to a supervisor or HR. (Grounds Decl. at ¶ 16).

14. The Company's Timekeeping policy also prohibits off-the-clock work, requires all hours worked to be recorded and paid regardless of employees' work schedules, and provides for payment of overtime when an employee works more than 40 hours in a workweek. (Grounds Decl. at ¶ 16).

15. All Care Coordinators and supervisors receive timekeeping training. (Grounds Decl. at 18).

16. Supervisors review Care Coordinator time cards on a weekly basis and have the ability to edit their time punches (e.g., missed punches or edits requested by Care Coordinators), as do Care Coordinators themselves. (Grounds Decl. at ¶ 18).

17. Care Coordinators have been repeatedly reminded that they need to record all hours worked, regardless of their scheduled hours. (Grounds Decl. at ¶ 19).

18. Both Mr. Dickerson and Ms. Russell received warnings or reminders to record all time accurately. (Grounds Decl. at ¶¶ 5, 7).

19. Care Coordinators, including Plaintiffs, have routinely recorded, and been paid for hours outside their scheduled hours, though it varies by individual. (Grounds Decl. at ¶ 19).

### D. Plaintiff Taiwan Dickerson's Employment

20. Mr. Dickerson worked as an hourly, non-exempt Care Coordinator for Arkansas Total Care from April 9, 2018 to July 29, 2021. (Deposition Transcript of Taiwan Dickerson ("Dickerson Tr."), excerpts of which are attached as **Ex. B** at 18:3-6; Dickerson Depo. Ex. 4 (Dickerson HRIS File), attached

3

as **Ex. C** at p.1).

21. Mr. Dickerson admitted that CMC had written policies "prohibiting [employees] from working off-the-clock" and "requiring [employees] to report all time worked." (Dickerson Tr. at 19:5-16; Dickerson Depo. Ex. 2 (Dickerson's Responses to Defendants' First Set of Requests for Admission), attached as **Ex. D**, Nos. 1-2).

22. Mr. Dickerson further admitted that he understood Centene's Timekeeping Policy, which he reviewed during his onboarding, received in the Employee Handbook, and could access via the CNET intranet. (Dickerson Tr. 18:14-19:4; Dickerson Depo. Ex. 5 (Centene Corporation Employee Handbook 2019 attached as **Ex. E**).

23. Mr. Dickerson agreed that he understood and would comply with the timekeeping policy. (Dickerson Tr. 16:23-17:3; 19:5-16).

24. During his employment, Mr. Dickerson was re-trained on how to properly enter his time as part of a performance improvement plan. (**Ex. C** at p. 32-34; Dickerson Tr. 64:10-65:4).

25. Mr. Dickerson understood that he should report any timekeeping or pay inaccuracies to his supervisor or HR. (Dickerson Tr. 25:5-26:10).

26. Mr. Dickerson also admitted that he "received training about the requirement to report all of [his] hours worked" and "had access to the company's timekeeping system and knew how to operate it," was "capable of submitting corrections," and "was required to approve [his] time record in order to have [his] payroll processed." (Dickerson Tr. 64:17-65:4, 94:1-4; **Ex. D**, Nos.4, 10, 12-13).

27. Furthermore, Mr. Dickerson testified that the hours he worked were accurately stated on his timesheets and pay stubs. (Dickerson Tr. 89:2– 90:7, 91:1-17; Dickerson Depo. Ex. 9 (Dickerson Pay Stubs) attached as **Ex. F**; and Dickerson Depo. Ex. 10 ( Dickerson Time Report (highlighted)), attached as **Ex. G**).

28. Although Mr. Dickerson testified in conclusory fashion that he was told to clock out at 5:00 pm, he could not recall who told him to do so or how or when he learned of this alleged "policy." (Dickerson Tr. 96:7-22).

29. Indeed, to the contrary, the record demonstrates 177 instances of Mr. Dickerson recording

4866-4918-5452.4 / 095402-1034

time worked past 5:00 p.m. (**Ex. G**).

30. Relatedly, Mr. Dickerson also testified that at times, when he worked past 5:00 p.m. without logging his time, he would notify his supervisor, Shantonio Elliott, who would edit Mr. Dickerson's timesheet accordingly to ensure he was paid for the overtime. (Dickerson Tr. 93:1-16, 97:16-24; 99:16-102:19; Dickerson Depo. Ex. 11 (Dickerson Audit Report), attached as **Ex. H**).

31. In fact, Mr. Dickerson could not recall a single instance where he told Mr. Elliott to update his time and it was not updated accordingly. (Dickerson Tr. 102:20-103:4).

32. Contrary to Mr. Dickerson's vague testimony that "there's nothing reflected showing that [he] was, you know, getting any overtime after 5:00," his own testimony, the four pages of documents he produced, his timesheets, and his pay records demonstrate that Mr. Dickerson regularly recorded overtime hours and was paid for all of those hours. (Dickerson Tr. 68:23-25; **Ex. F**; Dickerson Depo. Ex. 13 (DICKERSON000001-000004), attached as **Ex. I**).

33. Specifically, Mr. Dickerson recorded and was paid overtime for 22 out of 41 pay periods during his employment at Arkansas Total Care. (Dickerson Tr. 118:1-119:5; **Ex. F**).

34. Mr. Dickerson took 92 days of PTO during his employment and admitted he would not have worked overtime those weeks, and he only recorded TruCare notes after 5:00 p.m. on eight days. Mr. Dickerson agreed that TruCare notes should be an accurate record of the work he performed. (Dickerson Tr. 52:11-13, 116:16-119:5; Dickerson Depo. Ex. 12 (Dickerson TruCare Notes), attached as **Ex. J**).

35. When Mr. Dickerson resigned, his email stated that he had a "wonderful learning and building experience with Arkansas Total Care" and mentioned nothing regarding the allegedly unpaid overtime. (Dickerson Tr. 129:21-130:6; Dickerson Dep. Ex. 16 (Email from Taiwan Dickerson to Shantonio Elliott and Lauren Grounds dated 7/26/2021), attached as **Ex. K**).

36. During his deposition, Mr. Dickerson for the first time indicated his claim in this matter only relates to allegedly unpaid mileage reimbursements, even though the FAC contains no such allegations. (Dickerson Tr. 121:18-21).

37. Mr. Dickerson was reimbursed for Personal Car Mileage for 160 dates; he failed to identify a single instance of when he allegedly entered his mileage reimbursement and was not paid; he admitted

that at times, he did not even submit his reimbursement so his employer had no notice; and he has no documentary evidence of the amounts he is allegedly owed. (Dickerson Tr. 57:18-22; Dickerson Dep. Ex. 7 (Dickerson Travel and Business Expense Detail), attached as **Ex. L**).

38. In his attorney-assisted response to Interrogatory No. 6, Mr. Dickerson estimated that "on average [he] worked approximately 15 hours per week that went uncompensated." (Dickerson Depo. Ex. 1 (Dickerson's Answers and Responses to Defendants' First Set of Interrogatories and Requests for Production of Documents), attached as **Ex. M**, at No. 6).

39. This "estimate" doubled to 30 hours per week in Mr. Dickerson's recent Supplemental Disclosures dated April 12, 2024. (Plaintiffs' Supplemental Disclosures Pursuant to Rule 26(a)(1) attached as **Ex. N**).

40. Yet, during his deposition, Mr. Dickerson could not provide any details regarding how many times he allegedly worked unrecorded overtime. (Dickerson Tr. 92:23-93:16).

41. Mr. Dickerson admitted that he has no records to support his claims. (Dickerson Tr. 102:20-103:4).

42. Mr. Dickerson could not explain why he worked hours that he did not record during his employment, nor could he explain why he frequently recorded overtime but allegedly did not on "under ten" occasions. (Dickerson Tr. 120:8-18).

**E.    Plaintiff Kim King-Macon's Employment**

43. Ms. King-Macon worked as an hourly, non-exempt Care Coordinator for Arkansas Total Care from March 11, 2019 to July 24, 2019. (Deposition Transcript of Kim King-Macon ("King-Macon Tr.") excerpts of which are attached as **Ex. O**, at 22:1-5; King-Macon Depo. Ex. 20 (HRIS File), attached as **Ex. P,** at p.1).

44. Ms. King-Macon admitted that CMC had written policies "prohibiting employees from performing work off-the-clock" and "requiring employees to report all of the time they worked." (King-Macon Tr. 16:24-17:7; King-Macon Depo. Ex. 18 (Request for Admissions), attached as **Ex. Q,** at Nos. 1-2).

45. Ms. King-Macon further admitted she understood CMC's timekeeping policy, which she

6

reviewed during her onboarding, received in the Employee Handbook, and could access via CNET. (King-Macon Tr. 17:1-7, 22:14-23:12).

46. Ms. King-Macon agreed that she understood and would comply with the timekeeping policies. (King-Macon Tr. 17:1-7).

47. Ms. King-Macon also understood that she should report any timekeeping or pay discrepancies to payroll. (King-Macon Tr. 24:16-22).

48. Ms. King-Macon admitted that she "received training about the requirement to report all of [her] hours worked," "had access to the company's timekeeping system and knew how to operate it," was "capable of submitting corrections," and "was required to verify the time record in order for her payroll to be processed." (King-Macon Tr. 27:25-28:10; 69:24-70:1; **Ex. Q** at Nos. 4, 10, 12-13).

49. Furthermore, Ms. King-Macon testified that the hours she worked were accurately stated on her timesheets and pay stubs. (King-Macon Tr. 23:10-12; 66:16-19, 69:9-11; King-Macon Depo. Ex. 22 (King-Macon Pay stubs), attached as **Ex. R**; King-Macon Depo. Ex. 23 (Time records (highlighted)), attached as **Ex. S**).

50. Ms. King-Macon confirmed that no supervisor told her to clock out at 5:00 p.m. and keep working. (King-Macon Tr. 56:14-20, 62:19-22, 71:15-18).

51. Ms. King-Macon recorded and was paid overtime for 7 of 17 pay periods.(King-Macon Tr. 72:24-73:17; **Ex. R**).

52. Ms. King-Macon was only employed for 94 work days, took 11 PTO days, arrived to work late 49 times (for which she was placed on a performance improvement plan), and only recorded TruCare notes after 5:00 p.m. on ten days. (King-Macon Tr. 40:4-5; 74:18-75:8; **Ex. R**; King-Macon Depo. Ex. 24 (TruCare Notes and Excerpts), attached as **Ex. T**).

53. Furthermore, even if Ms. King-Macon was working additional hours without recording her time accurately, she repeatedly testified that Defendants did not know she was doing so. (King-Macon Tr. 63:2-5, 69:15-18).

54. In her attorney-assisted response to Interrogatory No. 6, Ms. King-Macon estimated that she worked "approximately 3-4 hours per week that went unrecorded and uncompensated." (King-Macon

Depo. Ex. 17 (King-Macon Answers and Responses to Defendants' First Set of Interrogatories and Requests for Production of Documents), attached as **Ex. U**, at No. 6).

55. This "estimate" doubled to 8 hours in Ms. King-Macon's recent Supplemental Disclosures dated April 12, 2024. (**Ex. N**).

56. Yet, during her deposition, Ms. King-Macon likewise could not provide any details on how many times she allegedly worked overtime and did not record her hours. (King-Macon Tr. 93:24-95:3, 96:6-15).

57. Ms. King-Macon admitted that she has no records to support her claims. (King-Macon Tr. 96:12-13).

F. **Plaintiff Tiffany Russell's Employment**

58. Ms. Russell worked as an hourly, non-exempt Care Coordinator for Arkansas Total Care from September 17, 2018 to March 22, 2021. (Deposition Transcript of Tiffany Russell ("Russell Tr."), excerpts of which are attached as **Ex. V** at 24:4-8; Russell Depo. (Ex. 30, Russell HRIS file), attached as **Ex. W** at p.1).

59. Ms. Russell admitted that CMC had written policies "prohibiting employees from performing work off-the-clock" and she was aware that "employees were supposed to report all time in the timekeeping system accurately." (Russell Tr. 24:16-23; Russell Depo. Ex. 27 (Russell Responses to Requests for Admissions), attached as **Ex. X**, at Nos. 1-2).

60. Ms. Russell further admitted that she understood Centene's Timekeeping Policy, which she reviewed during her onboarding, received in the Employee Handbook, and could access via CNET. (Russell Tr. 24:9-23, 26:4-9).

61. Ms. Russell agreed that she understood and would comply with the timekeeping policy. (Russell Tr. 29:11-25).

62. Ms. Russell was re-trained and reminded by her supervisor (including in weekly emails and as part of a performance improvement plan) on how to properly enter her time. (Russell Tr. 75:13-17; **Ex. W** at p. 20-23; Russell Depo. Ex. 31 (Calendar invites), attached as **Ex. Y**).

63. In addition, Ms. Russell understood that she should report any timekeeping or pay

discrepancies immediately. (Russell Tr. 27:6-11).

64. Ms. Russell also admitted that she "received training about the requirement to report all of [her] hours worked" and "had access to the company's timekeeping system and knew how to operate it," was "capable of submitting corrections," and "was required to approve [her] time record in order to have [her] payroll processed." (Russell Tr. 28:22-29:8, 29:11-14, 30:1-3, 100:21-23; Ex. X at Nos. 4, 10, 12-13).

65. Ms. Russell testified that the hours she worked were accurately stated on her timesheets and pay stubs. (Russell Tr. 97:14-17, 100:18-20; Russell Depo. Ex. 34 (Pay stubs), attached as **Ex. Z**; Russell Depo. Ex. 35 (Time records (highlighted)), attached as **Ex. AA**).

66. Ms. Russell also testified that at times when she forgot to properly clock in or out, she would correct her own time sheet or notify her supervisor, Terrie Fain-Holloway, who edited Ms. Russell's timesheet to ensure she was paid for the hours she worked, including overtime. (Russell Tr. 100:21-23; 101:18-24, 103:20-104:8; Russell Depo. Ex. 36 (Time edits), attached as **Ex. BB**).

67. Ms. Russell could not recall a single instance where she told Ms. Fain-Holloway to correct her time and it was not corrected accordingly. (Russell Tr. 101:25-102:9).

68. Ms. Russell's testimony, her timesheets, and her pay records demonstrate that Ms. Russell regularly recorded overtime and was paid for it. (Russell Tr. 138:3-139:18; Russell Dep. **Exs. Z, AA**).

69. Specifically, the undisputed record shows that Ms. Russell recorded time before 8 a.m. at least 129 times and recorded time after 5:00 p.m. 204 times, resulting in Ms. Russell earning overtime during 26 out of 50 pay periods. (**Exs. Z, AA**).

70. Ms. Russell was on a medical leave for almost three months between April 11 to July 7, 2020, and from her return from leave to her termination in March 2021, she worked a reduced schedule with a 30% lighter caseload, multiple breaks throughout the day, and 4-5 days of intermittent leave per month. (Russell Tr. 131:15-18, 134:12-25, 158:15-20; **Exs. Z, AA**).

71. Furthermore, Ms. Russell did not raise any issues regarding lack of overtime pay to CMC at any time during her employment. (Russell Tr. 68:17-69:4). According to Ms. Russell, the Arkansas Labor Board directed her to Plaintiffs' counsel's firm; and now Ms. Russell is bringing an unpaid wage claim, without ever having considered or complained about this issue previously. (Russell Tr. 164:4-18).

72. Even if Ms. Russell was allegedly working additional hours without recording it (for which there is no evidence), she repeatedly testified that she never told CMC she was doing so, her supervisor never instructed her to clock out and continue working, and in fact explicitly instructed Russell to accurately record her time. (Russell Tr. 51:18-53:24, 90:24-91:17, 137:2-5, 176:24-25).

73. In her attorney-assisted response to Interrogatory No. 6, Ms. Russell estimated that she worked "approximately 7-10 hours per week that went unrecorded and uncompensated." (Russell Depo. Ex. 26 (Russell Answers and Responses to Defendants' First Set of Interrogatories and Request for Production of Documents), attached as **Ex. CC,** at No. 6). This "estimate" doubled to 20 hours in her recent Supplemental Disclosures dated April 12, 2024. (**Ex. N**).

74. Yet, during her deposition, Ms. Russell's estimate of this alleged time worked varied wildly (i.e. 1-2 times per week, 2-3 times per week, 3-7 hours per week), and she could not provide any concrete details about how many times she allegedly worked overtime and did not record her hours. (Russell Tr. 36:22-23, 73:20-21, 136:15-22).

75. Ms. Russell was on leave for approximately three months and did not work at all during that time, and following her leave, through the end of her employment, she had a 30% reduced case load and was able to take at least four days off per month. (Russell Tr. 128:23-25, 129:8-130:3, 130:20-25, 131:15-18, 133:13-134:25).

76. Even though she cannot point to specific times and days she allegedly worked while not clocked in, Ms. Russell testified she recorded these alleged hours on *a notepad that she destroyed during the pendency of this litigation, so she has no documentary evidence to support her allegations.* (Russell Tr. 176:15-178:4).

**G.    Laertha Banks et al. v. Centene Management Co. LLC et. al.**

77. On May 18, 2021, Plaintiffs' counsel filed a putative collective action on behalf of Laertha Banks and Aria Lambert under the FLSA and the Arkansas Minimum Wage Act in the U.S. District Court of the Eastern District of Arkansas. (*Banks et al. v. Centene Management Co. LLC et al.*, Case No. 4:21-cv-00429-DPM, ECF No. 1 (E.D. Ark. May 18, 2021) attached as **Ex. DD**).

78. In *Banks*, the plaintiffs alleged that Defendants "failed to pay [plaintiffs] and other

10

similarly situated employees 1.5x their regular rate for all hours worked in excess of 40 per week." specifically with regard to bonuses that were allegedly not included in calculating overtime pay. (**Ex. DD** at ¶¶ 35, 57).

79. On September 29, 2021 and November 11, 2021, Mr. Dickerson and Ms. King-Macon filed their respective consents to join the *Banks* action. (*Banks et al. v. Centene Management Co. LLC et al.*, Case No. 4:21-cv-00429-DPM, ECF Nos. 10-11 (E.D. Ark. Sept. 29, 2021 and Nov. 11, 2021) attached as **Exs. EE, FF**). They both sought to recover for unpaid overtime wages and agreed to be bound by any Court judgment. **Exs. EE, FF**.

80. On January 31, 2022, Defendants moved to dismiss any FLSA collective action claims as the plaintiffs had failed to file a timely motion for collective certification. (*Banks et al. v. Centene Management Co. LLC et al.*, Case No. 4:21-cv-00429-DPM, ECF No. 15 (E.D. Ark. Jan. 31, 2022) attached as **Ex. GG**).

81. Two weeks later, the *Banks* plaintiffs attempted to amend their complaint to add opt-in plaintiffs Mr. Dickerson and Ms. King-Macon as named plaintiffs and bring additional collective claims regarding off-the-clock work for CCs. (*Banks et al. v. Centene Management Co. LLC et al.*, Case No. 4:21-cv-00429-DPM, ECF No. 21-1 (E.D. Ark. Feb. 14, 2022) attached as **Ex. HH**).

82. On March 23, 2022, the *Banks* Court denied plaintiffs' motion for conditional certification, and also denied their motion to amend the complaint to bring collective claims. (*Banks et al. v. Centene Management Co. LLC et al.*, Case No. 4:21-cv-00429-DPM, ECF No. 25 (E.D. Ark. Mar. 23, 2022) attached as **Ex. II**). The *Banks* Court specifically noted that plaintiffs had until September 9, 2022, to amend the pleadings. (**Ex. II**).

83. On October 31, 2022, Defendants moved for summary judgment in *Banks*. (*Banks et al. v. Centene Management Co. LLC et al.*, Case No. 4:21-cv-00429-DPM, ECF No. 28 (E.D. Ark. Oct. 31, 2022) attached as **Ex. JJ**).

84. On September 22, 2023, the *Banks* Court granted summary judgment in favor of Defendants and dismissed the case. (*Banks et al. v. Centene Management Co. LLC et al.*, Case No. 4:21-cv-00429-DPM, ECF No. 43 (E.D. Ark. Sept. 22, 2023) attached as **Ex. KK**). In doing so, the *Banks* Court

included Mr. Dickerson and Ms. King-Macon as named plaintiffs (as the parties' briefing had treated them as such) and bound them to the judgment. (Ex. LL; *Banks et al. v. Centene Management Co. LLC et al.*, Case No. 4:21-cv-00429-DPM, ECF Nos. 44 (E.D. Ark. Sept. 22, 2023) attached as **Ex. LL**).

Dated this 1st day of May, 2024.

> /s/ Breanne Sheetz Martell
> Breanne Sheetz Martell, #39632 (WA)
> *Admitted Pro Hac Vice*
> bsmartell@littler.com
>
> LITTLER MENDELSON, P.C.
> One Union Square
> 600 University Street, Suite 3200
> Seattle, WA 98101
> Telephone: 206.623.3300
> Facsimile: 206.447.6965
>
> Patricia J. Martin #57420 (MO)
> pmartin@littler.com
>
> LITTLER MENDELSON P.C.
> 600 Washington Avenue
> Suite 900
> St. Louis, MO  63101
> Telephone:     314.659.2000
> Facsimile:      314.659.2099
>
> Eva C. Madison, #98183 (AR)
> *Admitted Pro Hac Vice*
> emadison@littler.com
>
> LITTLER MENDELSON, P.C.
> 17 E. Dickson St., Suite 204
> Fayetteville, AR 72701
> Telephone: 479.582.6100
> Facsimile: 479-582-6111
>
> Natalie J. Storch, #269920(FL)
> *Admitted Pro Hac Vice*
> njstorch@littler.com

>LITTLER MENDELSON, P.C.
>111 North Orange Avenue
>Suite 1750
>Orlando, FL 32801
>Telephone: 407.393.2900
>Facsimile: 407-393-2929

**ATTORNEYS FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 1st day of May, 2024, a true and correct copy of the above and foregoing **Statement Of Uncontroverted Material Facts In Support Of Defendants' Motion for Summary Judgment** was electronically filed with the court using the CM/ECF system, which sent notification to all parties in interest participating in the CM/ECF.

>*s/ Breanne Sheetz Martell*
>BREANNE SHEETZ MARTELL

4866-4918-5452.4 / 095402-1034