Exhibit O

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE EASTERN DISTRICT OF MISSOURI

2                   EASTERN DIVISION

3

4     TAIWAN DICKERSON and KIM

      KING-MACON,Each Individually and on

5     Behalf of All Other Similarly Situated,          PLAINTIFFS

6

7

                    CASE NO. 4:22-cv-00519-HEA

8

9

      CENTENE MANAGEMENT COMPANY,

10    LLC, and CENTENE CORPORATION,                     DEFENDANTS

11

12

13

14

15

16

17    -------------------------------------------------------------

18

19              DEPOSITION OF KIM KING-MACON

20

21                  DECEMBER 9, 2022

22

23                   11:00 A.M.

24

25    -------------------------------------------------------------

                                                      Page 1

Kim King-Macon - December 9, 2022

```
1                        INDEX

2

        CAPTION PAGE. . . . . . . . . . . . . . . . . . . . . 1

3

        APPEARANCES . . . . . . . . . . . . . . . . . . . . . 3

4

        PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . 4

5

        END OF PROCEEDINGS. . . . . . . . . . . . . . . . . 99

6

        COURT REPORTER'S CERTIFICATE. . . . . . . . . . . . 100

7

8

9                     EXHIBITS                      MARKED

10      DEFENDANT'S

11      EXHIBIT 5 - Employee Handbook. . . . . . . . . . . . 22

12      EXHIBIT 14 - TruCare Records Summary . . . . . . . . 87

13      EXHIBIT 17 - Answers to Interrogatories. . . . . . . 10

14      EXHIBIT 18 - Request for Admissions. . . . . . . . . 15

15      EXHIBIT 19 - Acceptance Letter . . . . . . . . . . . 16

16      EXHIBIT 20 - HRIS Employee File. . . . . . . . . . . 21

17      EXHIBIT 21 - Expense Reimbursement . . . . . . . . . 59

18

19      EXHIBIT 22 - Pay-stubs . . . . . . . . . . . . . . . 66

20

21      EXHIBIT 23 - Time Records. . . . . . . . . . . . . . 68

22

23      EXHIBIT 24 - TruCare Notes . . . . . . . . . . . . . 77

24

25      EXHIBIT 25 - Declaration . . . . . . . . . . . . . . 97

                                              Page 2
```

Kim King-Macon - December 9, 2022

```
 1                          A P P E A R A N C E S

 2

 3          ON  BEHALF  OF  PLAINTIFFS

 4          DANIEL  FORD,  ESQUIRE

            SANFORD  LAW  FIRM,  PLLC

 5          650  SOUTH  SHACKLEFORD,  SUITE  411

 6          LITTLE  ROCK,  ARKANSAS   72211

 7          501-221-0088

 8

 9

10

11

12          ON  BEHALF  OF  DEFENDANTS

13

14          NATALIE  STORCH,  ESQUIRE

15          LITTLER  MENDELSON,  P.C.

16          600  UNIVERSITY  STREET,  SUITE  3200

17          SEATTLE,  WASHINGTON   98101

18          206-623-3300

19

20

21          BREANNE  SHEETZ  MARTELL,  ESQUIRE

22          LITTLER  MENDELSON,  P.C.

23          600  UNIVERSITY  STREET,  SUITE  3200

24          SEATTLE,  WASHINGTON   98101

25          206-623-3300
```

Page  3

Kim King-Macon - December 9, 2022

1    Q    Do you have any changes to these responses?

2    A    I do not have any changes in those responses.

3    Q    Thank you.  How did you learn about the job with Centene?

4    A    I put in an application online.

5    Q    And how did you hear about the opportunity?

6    A    My old job, with Forever Care, told us about it because

7    they were going out of business.

8    Q    And why did you apply?

9    A    I applied because I needed a job.  My job was being

10   discontinued.

11   Q    Okay.  Did you receive an offer letter?

12   A    I did.

13   Q    All right.  I'm going to introduce the next exhibit.  This

14   is going to be Exhibit 19.

15                    DEFENDANT'S EXHIBIT #19 ENTERED

16   BY MS. STORCH

17   Q    Okay.  I'm going to share my screen.  All right.  Does

18   this look familiar?  This is Exhibit 19 I'm introducing.  I'll

19   scroll through.  Is this a correct copy of the offer letter you

20   received?

21   A    I really -- that has been so long ago, it may be the

22   letter.  I really can't tell you because that has been a while

23   back.  It may have been the letter that I got.  I don't know.

24   Q    All right.  Did you accept the terms of the letter?

25   A    I did accept the terms of the letter.  Yes, I did.

                                              Page 16

Kim King-Macon - December 9, 2022

```
1    Q     And on this page right here, I'm going to highlight, it
2    says you agree -- oops, it's highlighting more than I would like
3    it to -- it says you'll agree you'll abide by all policies,
4    practices and procedures of Centene which are subject to change
5    at any time in the sole discretion of Centene.  Did you agree
6    that you would abide by all the policies of Centene?
7    A     I did.
8    Q     All right.  And you did comply with -- did you comply with
9    all the policies of Centene during your employment?
10   A     I did comply with some, yes.
11   Q     Okay.  Which ones did you not comply with?
12   A     And you're speaking specifically about which ones?
13   Q     That's what I'm asking you.  You said you didn't comply
14   with all of the policies.  Which ones did you not comply with?
15   A     I mean, I did work some overtime.
16   Q     Say that one more time.  I'm sorry.
17   A     I worked overtime.
18   Q     You worked overtime?
19   A     I did.
20   Q     And you said that was not complying with the policy?
21   A     That was not in compliance with their policy.
22   Q     Okay.  Why was that?
23   A     In order for me to effectively do my job, I had no choice.
24   Q     Okay.  What policy are you talking about that was not in
25   compliance with?
```

Page 17

Kim King-Macon - December 9, 2022

1    Q    Well it says terminated July 24th.

2    A    Okay.

3    Q    It says hired March 11th.  Do you have any reason to doubt

4    that that would be accurate?

5    A    I mean, it may be accurate.  I can't say that.  I don't

6    know.  I mean --

7    Q    Okay.  And during your employment, did you receive

8    policies regarding proper time-keeping and off-the-clock work?

9    A    I don't remember.  I don't remember getting a proper time-

10   keeping.

11   Q    Okay.  I'm going to introduce Exhibit 5.  Did you receive

12   a copy of the Employee Handbook for Centene?

13   A    I did.

14   Q    Okay.  This is Exhibit 5, and you had access to this

15   handbook; correct?

16   A    I think it was in my desk.  Yes.

17                    DEFENDANT'S EXHIBIT #5 ENTERED

18   BY MS. STORCH

19   Q    Okay.  All right.  On Page 5, of this document, it says

20   employees are expected to know and abide by the Centene

21   policies outlined in this handbook and on CNET.  Do you see

22   that at the bottom of the last paragraph?

23   A    Yes.

24   Q    Okay.  Did you have access to the company's intranet on

25   CNET?

Page 22

Kim King-Macon - December 9, 2022

1   A   Yes.

2   Q   And on Page 15, of this document, maybe -- okay.  Do you

3   see on this page, at the very top, employees who are classified

4   as non-exempt must accurately record the time they work each

5   day, including arrival, departure, and meal-break times?

6   A   Yes.

7   Q   Okay.  The policies require you to accurately record all

8   of your time; correct?

9   A   Yes.

10   Q   Okay.  And you recorded your time that you worked

11   accurately; is that correct?

12   A   I did.

13   Q   Okay.  I'm going to go to the next policy and -- oops,

14   sorry about that -- okay.  Then it says, further in this

15   policy, is a violation of company's policy for anyone to

16   instruct or encourage another employee to work off-the-clock or

17   to incorrectly report hours worked or to alter another

18   employee's time records.  If an employee is directed or

19   encouraged to incorrectly report hours worked or to alter

20   another employee's time records, they should report the

21   incident immediately to a supervisor or local HR business

22   partner.  Do you see that?

23   A   Yes.

24   Q   Do you understand the policy of prohibiting off-the-clock

25   work?

Page 23

Kim King-Macon - December 9, 2022

```
 1    A    I understood the policy, yes.

 2    Q    Okay.  Did you ever report off-the-clock work or

 3    alteration of time records?

 4    A    I never altered anything.  I just didn't report it.  I

 5    just worked it and did not report it because I knew I would be

 6    in trouble.

 7    Q    Okay.  Did you ever report off-the-clock work, work that

 8    wasn't recorded?

 9    A    There was no need to report it because they would have --

10    they stated that they did not want us to work off-the-clock.

11    They didn't want us to work after 5:00.

12    Q    They said they didn't want you to work off-the-clock?

13    A    They didn't want us to work after 5:00.

14    Q    Okay.  Did you ever report that you had worked after 5:00?

15    A    No.

16    Q    Okay.  And this part of the policy says when non-exempt

17    employees receive their paychecks, they should verify

18    immediately their working time was recorded accurately and they

19    were paid correctly for all hours worked.  Discrepancies should

20    be reported to payroll immediately.  Did you understand that

21    policy?

22    A    I did but I also understood Lauren.

23    Q    And when you said you understood Lauren, what do you mean?

24    A    There is to be no work after 5:00, under any

25    circumstances.
```

Page 24

Kim King-Macon - December 9, 2022

```
 1   said to me in the email.

 2   Q    Did you ever say anything to Lauren?

 3   A    There wasn't a need to say anything to her.  We had visits

 4   in the office and our business did not go well.

 5   Q    Your visits did not go what?

 6   A    Well.

 7   Q    Why is that?

 8   A    We had two visits in our office.  Her understanding was

 9   zero.

10   Q    Her understanding was zero?

11   A    Yes.

12   Q    About what?

13   A    The time, after 5:00, the amount of members we had.  I had

14   two visits with her on that and it didn't -- I mean, she didn't

15   have an understanding on that.  She felt like in the time that

16   we had at work, we should have been able to deal with it.

17   Q    So she felt like you could have completed your work, with

18   the number of members you had, between 8:00 and 5:00?

19   A    We didn't have enough employees there so we had to take on

20   a different load, for her understanding, more of a load.

21   Q    And Lauren's understanding, it's your testimony, that she

22   believed that you could complete the work you were assigned in

23   the 8:00 to 5:00 range?

24   A    Correct.

25   Q    Okay.  So you understood the time-keeping policies and the
```

                                                          Page 27

Kim King-Macon - December 9, 2022

1    policy saying you needed to accurately record your time and

2    that you shouldn't work off-the-clock, etcetera; correct?

3    A    I did understand it.  Yes.

4    Q    Okay.  And you also received training about time-keeping;

5    correct?

6    A    I don't know so much as time-keeping.  I received training

7    on my job.

8    Q    Okay.  I'm going to pull up the HRIS file, the one that

9    showed your dates of employment, and I will show you this is a

10   record of your training in this file.  It's moving kind of fast

11   but I'll get to it in just a sec.  All right.  So on April

12   11th, it says --

13                 MS. MARTELL:  Natalie, I'm not sure

14          the document is being shared.

15                 MS. STORCH:  Oh, it's not being

16          shared.  Thank you.  I'm sharing it in my

17          head but I haven't shared it with you.  I'm

18          looking.  I apologize.

19   BY MS. STORCH

20   Q    All right.  So can you see that now?

21   A    I don't know what this is that keeps popping up on my

22   screen.  I'm sorry, go ahead.

23   Q    Can you see the HRIS file?

24   A    Yes.

25   Q    Okay.  Can you see that there -- I'm going to highlight it

Page 28

```
 1   monthly --

 2   A     I would assume that it's TruCare.  I don't remember the

 3   name of the system.  I can't tell you.

 4   Q     But you logged everything?

 5   A     Yes.  Everything had to be logged.

 6   Q     And what did you talk about in the month contact?

 7   A     How that patient -- that member was doing.  Either you

 8   spoke with the member, if that member was capable of speaking

 9   you, or you spoke with a guardian.

10   Q     And how long did that contact call take?

11   A     Most of the time it was already set up.  The initial call,

12   you would just make a call and go do a visit.  Either it was a

13   visit or a call, depending on what that member wanted to do.

14   Some of them wanted to see you, others wanted to call.

15   Q     So your monthly contact could have been in person?

16   A     Some were in person.  Some were just I called.

17   Q     Okay.  And when you were making the notes in the system,

18   TruCare or whatever it was called, you made that at the same

19   time as you did the contact, whether it was in person or over

20   the phone, while you were doing it?

21   A     If it was over the phone, you did it after.  If you did it

22   in person, you did after as well.  That had to be done at some

23   point either after you did it or when you were able to -- it

24   was supposed to have been done right after, but either after --

25   like if you were on the road.  Most of my visits were in the
```

Page 40

```
 1   through, what else can you do?

 2   Q    Okay.  Did you ever make any complaint, specifically,

 3   about pay?

 4   A    Mr. Elliott and I talked about it.

 5   Q    What did you talk about?

 6   A    He told me there was no need for us to try to work over

 7   because we could not.  It was set in stone, we could not.

 8   Q    Okay.  So he said you couldn't work past 5:00?

 9   A    We needed not to work past 5:00.

10   Q    Okay.  Did you ever have any -- so you were talking about

11   your work hours with Mr. Elliott, did you ever complain to

12   anyone about pay?

13   A    No.  My pay was fine.  I had no problem about my pay.

14   Q    And so you said you talked about Mr. Elliott -- talked

15   with Mr. Elliott about he said you couldn't work past 5:00;

16   correct?

17   A    That is correct.

18   Q    But he didn't ever tell you you have to work past 5:00,

19   but clock-out at 5:00; correct?

20   A    No.  He never gave me permission to do that.

21   Q    Okay.  When you were hired by Centene, you worked from

22   8:00 to 5:00 p.m., you've testified; correct?

23   A    Correct.

24   Q    Did you go to the office in the morning generally?

25   A    I went to the office all day when I began in the
```

Page 56

Kim King-Macon - December 9, 2022

```
 1    Q    What was the most you had to drive to a member?

 2    A    Forty, maybe fifty or more miles.  Maybe more sometimes.

 3   It just depends on where exactly it was because like I said, it

 4   was in Jefferson County.  Sometimes -- I can't remember exactly

 5   what the name of the city was.

 6    Q    Okay.  And you talked about a meeting with Lauren and you

 7   can't remember her last name, where she was telling you that

 8   you couldn't work past 5:00; correct?

 9    A    That was one of the meetings.  Yes.

10    Q    Okay.  Who else was at that meeting when that was talked

11   about?

12    A    Just she and I.

13    Q    No other Care Coordinators?

14    A    No.

15    Q    Okay.  And did you have team meetings with your team?

16    A    Yes.

17    Q    Were those required?

18    A    Yes.

19    Q    And when you and Lauren had the meeting about not working

20   past 5:00, she didn't tell you to clock-out at 5:00 and

21   continue working; correct?

22    A    No.  She didn't.

23    Q    Okay.  Is it your claim that you were never paid overtime?

24    A    No.  That's not my claim.  I may have gotten paid for

25   maybe five to seven minutes overtime.  It was never the doable
```

Page 62

```
 1   amount of time I worked over.
 2   Q    Okay.  But if you weren't clocked-in when you said you're
 3   working after 5:00, if you'd already clocked-out, nobody knew
 4   you were working that time; correct?
 5   A    After I -- no, they didn't.  You could say no.
 6   Q    Okay.  Let's see.  And we talked about the notes, at the
 7   beginning of the deposition, when I asked you if you'd reviewed
 8   anything to prepare, so you said you did look at your notes
 9   when you prepared for the deposition, so those are the notes
10   that I was talking about before.  I went back and looked at my
11   notes.  So you said you looked at notes that you had made to
12   prepare for the deposition.  Do you remember that?
13   A    I looked at some notes that I jotted down early on.
14   Q    Early on, okay.  Those are the notes that I'm talking
15   about.  Did you provide those to your attorney?
16   A    Those are notes that I jotted down that he and I -- after
17   he and I talked in the very beginning.
18   Q    In the very beginning of the case?
19   A    Yes.  There's nothing that I gave him.
20   Q    Okay.  You said sometimes you came back from your member
21   visits to the office.  Sometimes you didn't.  What time would
22   you get back to the office if you did return to the office?
23   A    I have no clue what time that would have been.  It just
24   would have been dependent upon the time that I finished my
25   visits.
```

Page 63

Kim King-Macon - December 9, 2022

```
 1    they did any personal items, activities?

 2    A    No.  I don't.

 3    Q    Okay.  I'm going to show your pay-stubs.  You might need

 4    your glasses for this exhibit.  The print is really small.  I

 5    might need two pairs of glasses for this exhibit.  Okay.

 6    A    Oh Christ.

 7    Q    Oh, it's not going to be that small.  There it is.  That's

 8    a little bit bigger.  Okay.  I'm going to scroll through.

 9    These are you pay-stubs from when you worked at Centene.  This

10    is Exhibit 22.  I'm introducing Exhibit 22.  I'm going to

11    scroll through.  If you'd like me to slow down, let me know.

12    A    Can you slow down, yes.

13    Q    I'm a fast scroller.

14                 DEFENDANT'S EXHIBIT #22 ENTERED

15    BY MS. STORCH

16    Q    Do these pay-stubs look like an accurate statement of what

17    was paid to you when you were working for Centene?

18    A    I assume so.  I don't remember all of that so I assume.  I

19    don't know.  That's a guess.

20    Q    Is it an accurate statement of the hours your worked?

21    A    Those are the accurate hours that I was paid.

22    Q    You were paid.  Is it an accurate statement of the hours

23    you reported you worked?

24    A    Yes.

25    Q    Okay.  When you received a paycheck and a pay-stub, did
```

Page 66

```
 1              DEFENDANT'S EXHIBIT #23 ENTERED

 2   BY MS. STORCH

 3   Q    Okay.  Do you see Exhibit 23 on the screen, Ms. King-

 4   Macon?  These are you time records.

 5   A    Okay.

 6   Q    You see it's got at the very top the punch-in and punch-

 7   out time.

 8   A    Okay.

 9   Q    Is there any reason to believe that these are not

10   accurate, the punch-in and punch-out time?

11   A    No.  I don't guess so.

12   Q    Okay.  Are you alleging that anyone ever changed your

13   time?

14   A    Oh, no, no, no.

15   Q    Okay.  And you said that you were working when you were

16   not clocked-in.  How would any supervisor ever know you were

17   working when you weren't clocked-in?

18   A    They wouldn't.

19   Q    Okay.  So you never complained to anyone that you weren't

20   paid because you were working when you weren't clocked-in?

21   A    I asked how were we supposed to complete our work in that

22   time and was told that was the only time we could work, and

23   there was no need to tell anyone if you're told that.

24   Q    Okay.  And if you forgot to clock-in or forgot to clock-

25   out, you were able to edit your time; correct?
```

                                                    Page 69

Kim King-Macon - December 9, 2022

1   A    They edited it for us.

2   Q    Okay.  But you could also edit your own time; correct?

3   A    Not with -- I don't think so.  No.  They would have to

4   edit it.

5   Q    Okay.  So if you missed a punch or something, if you

6   forgot to clock-out for lunch, how would you address that?

7   A    You would let the supervisor know, if I'm not mistaken,

8   and they would have to go in and change it.

9   Q    Okay.  So whatever edits are made to time, based on

10  whatever, a Care Coordinator would bring to the attention of

11  their supervisor, that would be very individual based on the

12  Care Coordinator; correct?

13  A    Could you repeat that again, please.

14  Q    So if there are any edits made to time, that would be

15  individualized based on the Care Coordinator; correct?  If they

16  needed edits to their time, that would be something that

17  wouldn't apply to everyone, it would just apply, situationally,

18  if you missed lunch or if another Care Coordinator missed lunch

19  or forgot to punch-in or punch-out, that would be specific to

20  that Care Coordinator.  It wasn't across the board for time

21  changes, like changing your time?

22  A    Well the time would have -- I don't think we could change

23  our time.  I think that was something that the supervisors

24  would have to do.

25  Q    Okay.  So each person's supervisor would change the folks

Page 70

```
 1    in their team.  They would be responsible for that?

 2    A    Yes.

 3    Q    It wasn't -- okay, got it.  And you said that you were not

 4    paid for the hours that you worked after 5:00, but nobody knew

 5    about it, but they said that the hours that you could work were

 6    8:00 to 5:00, and you said that Ms. Lauren communicated that to

 7    you in a one-on-one meeting.  Was there anyone else who

 8    communicated that to you ever?

 9    A    As I stated, again, I spoke with Mr. Elliott about it as

10    well.

11    Q    Okay.  Was that in a meeting or a one-on-one?

12    A    Just a conversation we had one-on-one.

13    Q    Okay.  Was there anyone else who communicated that to you?

14    A    No.

15    Q    Okay.  And was there any other circumstance, other than

16    those two one-on-one meetings with Mr. Elliott and Ms. Lauren,

17    where they said you only can work from 8:00 to 5:00?

18    A    No.

19    Q    Okay.  And other than the communication with the

20    receptionist where you weren't able to speak to the person you

21    wanted to speak to, making a general complaint that you wanted

22    to talk about some things, did you ever complain to anyone else

23    about your work or pay or hours?

24    A    Not my pay but my hours.  No.

25    Q    Okay.  Not anyone else besides the one complaint that you
```

Page 71

Kim King-Macon - December 9, 2022

```
 1    said they said they couldn't help you; correct?

 2    A    Correct.

 3    Q    Did you ever complain to HR, Human Resources?

 4    A    I don't think so.  No.

 5    Q    Okay.  So if you actually clocked-out after 5:00 -- you

 6    said there were some times where you clocked-out after 5:00,

 7    you were paid for all of that time; correct, if you actually

 8    clocked-out --

 9    A    I was.

10    Q    Okay.  I'm going to show you Exhibit 23.  It's the time

11    report that we just talked about.  I'll show you that again,

12    and I have -- it's another tab.  I just copied this information

13    over to the highlighted tab, and I highlighted in yellow the

14    times that you clocked-in before 8:00, slightly, and then the

15    times you clocked-out after 5:00.  Do you see all of those?

16    A    Yes.

17    Q    Okay.  And there's one at 6:07, do you see that?

18    A    I remember that day.

19    Q    6:00, 5:41, 5:26 was another one, 5:45, 6:52, 5:54.  So

20    all the times that were, you know, more than a couple of

21    minutes after 5:00, you were paid for all those if you clocked-

22    out after 5:00; correct?

23    A    Yes.

24    Q    Okay.  I'm going to show your pay-stubs again which is

25    Exhibit 22.  This is the first page and I'm going to go through
```

Page 72

Kim King-Macon - December 9, 2022

1    and I'm gonna just represent to you that there's several

2    instances where you actually were paid overtime, I think on

3    five instances.  So overtime is paid in this pay-period in

4    July, 2.17 hours.  Do you see that?

5    A    Uh-huh.

6    Q    Okay.  And, here, .61 hours.  Do you see that?

7    A    Uh-huh.

8    Q    1.18 hours in the pay-period in April.  .78 hours in May.

9    Do you see that?

10   A    Yes, ma'am.

11   Q    Okay.  And also in May, again, .51 hours, 2.17 hours, do

12   you see that one, July?

13   A    Yes.

14   Q    Okay.  I think that's the duplicate pay-stub for that one,

15   for 2.17.  It is.  So you would agree that you were paid some

16   overtime when you worked for Centene; correct?

17   A    Yes.  I stated that.

18   Q    Okay.

19   A    Those were hours when I was out in the field and with a

20   member.

21   Q    Okay.  So besides the overtime that you were actually paid

22   on your paychecks, how much more overtime are you saying that

23   you worked in a week?

24   A    Out in the field, like I was in Pine Bluff -- in the Pine

25   Bluff area with a member, that's fine, but once I left that

Page 73

Kim King-Macon - December 9, 2022

```
 1    member's house, on my way home, putting in those notes, I had

 2    to put that in on my time.  That extra time was not added in.

 3    Q    Driving home?

 4    A    The driving home was the mileage, but putting in the notes

 5    was not added in.

 6    Q    You're not claiming you weren't paid for mileage; correct?

 7    A    No.  I didn't say that.  No.

 8    Q    So you were paid for all your mileage?

 9    A    Yes.

10    Q    Okay.  It's just the notes when you got home?

11    A    Right.  Because I had already worked overtime.  That was

12    time put in that had to be put in for the notes.

13    Q    In TruCare, that system, when you were documenting stuff?

14    A    Correct.

15    Q    And you took time off during your employment with Centene;

16    correct, like vacation holiday?

17    A    I did.

18    Q    Okay.  And I'll pull up your records again, your time

19    records, and you see that, and I'm going to filter, which is

20    how I use consort, by the type of time off.  Holiday and

21    vacation so I'll sort by holiday and vacation, so here there is

22    one, two, three, four, five, six, seven, eight, nine, ten,

23    eleven days that you took holiday or vacation time.  Does that

24    sound about right, on these days?

25    A    I guess.
```

Page 74

Kim King-Macon - December 9, 2022

1  Q    Okay.  And you weren't working overtime in the weeks where

2  you had vacation or holiday; correct?

3  A    I don't -- I have no clue.

4  Q    Okay.  And when you were late the forty-nine times -- I

5  know you said you weren't late forty-nine times, but when you

6  were late to work, what were you doing, why were you late?

7  A    I don't know if it was because of the traffic or exactly

8  what it was.

9  Q    Okay.  And we talked about the record of your activities

10 -- hold on a second -- the record of your activities that you

11 logged.  You said sometimes it was after you visited a member

12 or was after you visited a member, you were documenting a

13 conversation; correct?

14 A    Correct.

15 Q    And you must document every contact in the TruCare System;

16 correct?

17 A    Yes.

18 Q    And did you document everything that you did?

19 A    Yes.

20 Q    Okay.  So every conversation you had with a member, every

21 visit you had with a member, you documented in the TruCare

22 System?

23 A    Yes.

24 Q    And so would your TruCare record activities show all the

25 contacts that you ever had with members?

Page 75

```
 1    member with Arkansas Total Care name.  I don't know what they

 2    put in the file but that was not discussed at the meeting.

 3    They refused to give me a termination letter.  They refused to

 4    give Unemployment a termination letter.

 5    Q    Okay.  Did you ever say anything during that meeting about

 6    your pay?

 7    A    No.

 8    Q    Okay.

 9              MS. STORCH:  I'm going to take a quick

10         break if you don't mind.

11              WITNESS:  Okay.

12              MS. STORCH:  Okay.  Like, what, ten

13         minutes.  Is that okay?

14              WITNESS:  Yes.

15              BREAK FROM 1:32 P.M. TIL 1:46 P.M.

16    BY MS. STORCH

17    Q    Hello, Ms. King-Macon, again.  I think we're almost

18    finished.  So we were talking about your termination when we

19    took a break, and when your employment ended, do you believe

20    that you were owed any money?

21    A    As I believe, while I was there, yes.

22    Q    Okay.  How much?

23    A    I can't give a dollar figure.

24    Q    Okay.  Can you estimate how many hours you think you were

25    owed for?
```

Page 93

Kim King-Macon - December 9, 2022

1    A    No.  I can't.

2    Q    Can you approximate?

3    A    No.

4    Q    Okay.  Two hours, would that be a fair estimate?

5    A    No.  That wouldn't.

6    Q    Okay.  So you don't know the number of hours that you

7    think you're --

8    A    No.  I spent nights at the hospital with my members.

9    Q    Okay.  But you didn't record any of that time; correct?

10   A    No.

11   Q    And nobody knew about it?

12   A    No.

13   Q    Okay.  So how did you learn about the litigation against

14   Centene?

15   A    I overheard.

16   Q    From whom?

17   A    Mr. Dickerson.

18   Q    Okay.  Did you talk to Mr. Dickerson about the litigation?

19   A    We were in the store.

20   Q    Where?

21   A    In the grocery store.

22   Q    Do you know Mr. Dickerson outside of work?

23   A    No.  We were in the grocery store and I saw him.

24   Q    How long after your employment with Centene ended?

25   A    I don't even know.

Page  94

Kim King-Macon - December 9, 2022

1   Q     Did you learn about the litigation prior to the time where

2   you signed an engagement agreement with your attorney?

3   A     Did I learn after?

4   Q     Did you learn before.  Well did you learn about the

5   litigation prior to the point where you signed the engagement

6   agreement?

7   A     I learned about it -- are you saying before -- I mean, I'm

8   not understanding what you're saying.

9   Q     The lawsuit that has been filed, you learned about it from

10  Mr. Dickerson.  Had he already filed the lawsuit?

11  A     I don't know.

12  Q     Okay.  Have you seen the video on your attorney's website?

13  A     No.

14  Q     Okay.  So our understanding is that you're claiming that

15  you reported hours outside of your schedule for which you were

16  not paid.  Is that your only claim in this lawsuit?

17  A     Yes.

18  Q     Okay.  Have we discussed all the hours you worked for

19  which you were not paid?

20  A     Yes.

21  Q     Okay.  And you said you don't know how many hours that is?

22  A     No.  I don't.

23  Q     Okay.  Can you give me a time-frame?  You said it wasn't

24  in the first couple of months you worked; is that correct, when

25  you were getting ramped up in March and April?

Page 95

Kim King-Macon - December 9, 2022

```
 1    A    That's correct.

 2    Q    So nothing in March and April?

 3    A    No.

 4    Q    Okay.  Anything in May or you were still getting ramped

 5    up?

 6    A    I mean, I can't tell you that.  I don't know what months

 7    it was but I can tell you that I spent several hours and I

 8    don't know exactly how many.

 9    Q    Several hours.

10    A    Yes.

11    Q    Several hours, okay.

12    A    I didn't write them down.  If I had, you know, it would be

13    different but I did not write them down.

14    Q    So ten or less?

15    A    I cannot tell you that.  I don't know.  As I stated, I

16    have spent -- I've had a mother call me and said her daughter

17    will not cooperate at Children's, on several occasions, and

18    she's asking for Ms. Kim, and Ms. Kim got up out of her bed and

19    went to Children's.  Care Coordinator, to me, that's part of my

20    job.

21    Q    Okay.

22    A    And I've also had to put in notes, on several occasions,

23    after my visits.  So, I mean, I can't give you a number.

24    Q    Okay.  I'm going to show you an exhibit which is going to

25    be Exhibit 25.  I'm sharing my screen.  This is your
```

Page 96

Kim King-Macon - December 9, 2022

```
 1                    REPORTER'S CERTIFICATE

 2         STATE OF ARKANSAS  )

 3         COUNTY OF PULASKI  )

 4             I, JANE HALL, Certified Court Reporter and Notary Public,

 5         do hereby certify that the facts stated by me in the caption on

 6         the foregoing proceedings are true; and that the foregoing

 7         proceedings were recorded verbatim through the use of the

 8         Stenomask, and thereafter transcribed by me to the best of my

 9         ability, taken at the time and place set out on the caption

10         hereto via Zoom Teleconference.

11             I FURTHER CERTIFY that I am neither counsel for, related

12         to, nor employed by any of the parties to the action in which

13         these proceedings were taken; and further, that I am not a

14         relative or employee of any attorney or counsel employed by the

15         parties hereto, nor financially interested, or otherwise, in

16         the outcome of this action.

17             WITNESS my hand and seal as such Official Court Reporter

18         on this the 9th day of December, 2022.

19

20

21

22

23                              JANE HALL, CCR

24

25                              CERTIFICATE NUMBER 735

                                              Page 100
```