Exhibit V

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF MISSOURI
2                       EASTERN DIVISION
3
                  CASE NO.:  4:22-CV-00519-HEA
4
5       TAIWAN DICKERSON and KIM
        KING-MACON, each individually
6       and on Behalf of All Others
        Similarly Situated,
7
                       Plaintiffs,
8       vs.
9       CENTENE MANAGEMENT COMPANY, LLC
        and CENTENE CORPORATION,
10
                       Defendants.
11      _____/
12
13
                 ZOOM VIDEOTAPED DEPOSITION OF
14
                       TIFFANY RUSSELL
15
16
17              Wednesday, March 27, 2024
                 10:06 a.m. - 3:06 p.m.
18
19
20              VIA VIDEOCONFERENCE
21
22
23
24           Stenographically Reported By:
25            Dawn Scott, Stenographer
```

Page 2

```
 1    APPEARANCES:
 2
      On behalf of Plaintiffs:
 3
          SANFORD LAW FIRM, PLLC
 4        650 South Shackleford
          Suite 411
 5        Little Rock, Arkansas 72211
          (501)221-0088
 6        BY:  SEAN SHORT, ESQ.
          sean@sanfordlawfirm.com
 7
 8    On behalf of Defendants:
 9        LITTLER MENDELSON, P.C.
          111 North Orange Avenue
10        Suite 1750
          Orlando, Florida 32801
11        (407)393-2900
          BY:  NATALIE J. STORCH, ESQ.
12            MADHURA PANJINI, ESQ.
          njstorch@littler.com
13
14
15
      ALSO PRESENT:  MICHAEL DINITTO, Videographer
16
17
18
19
20
21
22
23
24
25
```

Page 3

I N D E X

| WITNESS | PAGE |
|---|---|
| TESTIMONY OF TIFFANY RUSSELL | |
|     Direct Examination by MS. STORCH | 6 |
| Certificate of Oath | 181 |
| Certificate of Reporter | 182 |

E X H I B I T

| Defendant's Exhibit | Description | Page |
|---|---|---|
| Exhibit 26 | Copy of the interrogatories and the request for production | 15 |
| Exhibit 27 | Responses to the request for admissions | 17 |
| Exhibit 28 | 40 pages of documents produced | 18 |
| Exhibit 29 | Offer letter | 20 |
| Exhibit 30 | HRIS file | 23 |
| Exhibit 31 | Calendar invites | 51 |
| Exhibit 32 | Expense report | 82 |
| Exhibit 33 | Swipes into the building | 85 |
| Exhibit 34 | Pay stubs | 96 |
| Exhibit 35 | Time records | 100 |
| Exhibit 36 | Time edits | 101 |
| Exhibit 37 | TruCare records | 104 |
| Exhibit 38 | Time records | 120 |
| Exhibit 39 | Accommodation paperwork | 128 |

Page 4

1    Exhibit 40 Summary of TruCare records        155

2    Exhibit 41 First amended substituted complaint   165

3    Exhibit 42 Declaration of Tiffany Russell       165

4    Exhibit 43 Consent                              178

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Russell," it has your employee ID number, your

2  position; does that all look accurate?

3      A.   Yes.

4      Q.   It says your hire date is September 17th,

5  2018, and your date when your employment ended --

6  your termination date is March 22nd, 2021; does that

7  look accurate?

8      A.   Yes.  Yes.

9      Q.   All right.  When you started at Centene

10  you received policies regarding proper timekeeping;

11  is that correct?

12      A.   Yes.

13      Q.   Did you receive training on proper

14  timekeeping policies?

15      A.   Yes.

16      Q.   And you were aware that employees were

17  supposed to report all time in the timekeeping

18  system accurately, correct?

19      A.   Yes.

20      Q.   Did you understand that employees are

21  prohibited from working off the clock according to

22  policy at the company?

23      A.   Yes.

24      Q.   Are you aware that company policy

25  prohibited managers from discouraging employees to

1        All right.  Can you see the employee
2   handbook on the screen, Ms. Russell?
3        A.   Yes.
4        Q.   Did you receive a copy of the handbook
5   when you started your employment with Centene?
6        A.   Yes.
7        Q.   You had access to it; was it on a system
8   called CNET, do you recall that?
9        A.   It was on CNET, yes.
10       Q.   Okay.  All right.  So let me -- on page 5
11  of the handbook -- I don't know if you -- can you
12  see these?
13       A.   Yes.
14       Q.   Okay.  That you are -- it just talks about
15  being familiar with the policies.  Sorry.  It's
16  page -- it's this page 5.  Employees are expected to
17  know and abide by Centene policy outlined in the
18  handbook and on CNET, do you see that?
19       A.   Yes.
20       Q.   And you had agreed to comply with all
21  policies --
22       A.   Yes.
23       Q.   -- as stated in your offer letter as well?
24  Okay.  I'm going to turn to page 15 of this
25  particular exhibit.  Fifteen of the handbook, I

1   guess, it's 19 of the PDF.  It talks about nonexempt

2   employees.  It says, "Nonexempt employees must

3   report all time worked and not work any time that is

4   not authorized by their supervisors"?

5        A.   Yes.

6        Q.   And it also says, "When exempt employees

7   receive their paychecks, they should verify

8   immediately their working time was recorded

9   accurately, they were paid correctly.  Discrepancies

10  should be reported immediately," do you see that?

11       A.   Yes.

12       Q.   And it also talks about employees who are

13  classified as nonexempt must accurately record the

14  time they work each day, including arrival,

15  departure and meal break times and record actual

16  time in real time using the automated timekeeping

17  systems; this punch is entered as soon as possible,

18  do you see that also?

19       A.   Yes.

20       Q.   It says, "Nonexempt employees must

21  complete time records each day and may not rely on

22  the automated timekeeping system to populate their

23  time sheets, and employees who submit time sheets

24  with system-generated time may be subject to

25  discipline," do you see that?

Page 28

1      A.   Yes.

2      Q.   All right.  Did you understand all these

3 policies in the handbook that you received?

4      A.   Yes.

5      Q.   Did you ever report any discrepancies to

6 payroll in accordance with this policy that we just

7 went over?

8      A.   No.

9      Q.   It also goes on to say, "It's a violation

10 of the company's policy for anyone to instruct or

11 encourage another employee to work off the clock, to

12 incorrectly report hours worked or to alter another

13 employee's time records," do you see that?

14      A.   Yes.

15      Q.   "If any employee's directed or encouraged

16 to incorrectly report hours worked or to alter

17 another employees' time records, they should report

18 the incident immediately to a supervisor or the

19 local HR business partner," did you understand that

20 policy?

21      A.   Yes.

22      Q.   It also -- this policy on this page also

23 says, "That managers of nonexempt employees must

24 approve the time sheets in keeping payroll deadlines

25 and are prohibited from directing or encouraging

1  employees to inaccurately report time, fail to

2  report time and fail to manage employees who don't

3  follow timekeeping policies.  Managers are required

4  to manage people who don't follow timekeeping

5  policies and they're prohibited from changing or

6  altering time and are subject to discipline if they

7  do so," do you see that on this paragraph?

8      A.   Yes.

9      Q.   Did you understand that policy as well?

10     A.   Yes.

11     Q.   Okay.  All right.  You said you received

12  training about reporting -- about timekeeping and

13  proper recording of time, correct?

14     A.   Yes.

15     Q.   You know that you were supposed to record

16  all time worked, correct?

17     A.   I know that, yes.

18     Q.   Okay.  You know that it was prohibited --

19  that employees were prohibited from working when

20  they weren't clocked in, correct?

21     A.   Yes.

22     Q.   All right.  I am going to -- you received

23  training about reporting all hours that you worked,

24  correct?

25     A.   Yes.

1     Q.   And you received training on how to use

2  the timekeeping system that was in place at Centene?

3     A.   Yes.

4     Q.   What was the name of the timekeeping

5  system that you used?

6     A.   I can't -- I don't recall.

7     Q.   That's okay.  It's been a long time.

8  Okay.

9     A.   May have been Citrix.

10     Q.   Okay.  and in your role as a care

11  coordinator, what were your duties and

12  responsibilities?

13     A.   To advocate for our members, to do IEP

14  plans, visits, quarterly visits, speak with our

15  members at least once a month.  If we received

16  anything that -- if it was time for their annual

17  Medicare renewal, we have to remind them of that and

18  call Optum and make sure they were -- that they were

19  scheduled for that and they got their assessments.

20     Q.   Okay.

21     A.   Help with any -- provide any resources

22  that they may need, provide resource information if

23  they were -- to let them know about community

24  resources available.  Try to empower members to

25  advocate for themselves and empower them to be able

1   went to visit the member.

2        Q.   How often would you say that happened

3   where you had to document when you got back from a

4   member visit?

5        A.   Each time.

6        Q.   There was annual reviews each time that

7   you were documenting?

8        A.   No.  Annual reviews were once a month, but

9   we had 70 members, so those annual reviews never

10  stopped.  You were always doing a review on someone.

11  Everyone's year didn't start at the exact same time.

12       Q.   So are you saying that you didn't ever --

13  you were never clocked in for over 40 hours in a

14  week?

15       A.   There were times -- if I had it approved,

16  I was -- that I did.

17       Q.   So you did sometimes document when you

18  were clocked in, correct?

19       A.   Yes.  Yes.

20       Q.   How many times were you documenting when

21  you weren't clocked in?

22       A.   At least twice a week.  Two or three times

23  a week, yes.

24       Q.   How often do you think you got approval

25  for overtime?

1  but she was on another aisle and Taiwan was across

2  the hall -- across the aisle, to the left of me

3  somewhere in there.  So we weren't sitting by each

4  other.  Everyone had their own private cubicle area.

5      Q.   So did you know anything about the hours

6  that Mr. Dickerson or Ms. King-Macon were working?

7      A.   No.  I had my own issues.

8          (Thereupon, the calendar invites was

9      marked as Defense 31.)

10   BY MS. STORCH:

11     Q.   So you've already talked about that you

12  received training about proper time entry and the

13  policies related to the proper entry of time.  I'm

14  going to introduce an exhibit right now.  Sorry.

15  This is going to be Exhibit 30 -- no, it's not.

16  It's going to be Exhibit, I believe it's 31.  Hold

17  on.  31.

18          All right.  I am going to share my screen.

19  I'll blow it up also so you can see it better.  All

20  right.  This is Exhibit 31.  And let me blow it up,

21  because it's really small.

22          All right.  It says "redacted," that's

23  other people's names that we redacted.  You see the

24  date it says, sent 1/25/2021 by Terrie

25  Fain-Holloway, Ms. Holloway -- of Fain-Holloway is

1  your supervisor, correct?

2      A.    Correct.

3      Q.    And this looks like it's a calendar

4  reminder.  It says to start on 1/1/2021, end on

5  1/2/21, and recurs on every Friday, correct?

6      A.    Yes.

7      Q.    This is a reminder to Ms. Fain -- is it

8  Fain or Fain-Holloway?

9      A.    I don't know.

10      Q.    Okay.  Ms. Fain.  Reminder to the team to

11  review time sheets each Friday, check for

12  exceptions, make corrections daily, same day or

13  following day make the corrections, acknowledge and

14  submit the time sheet and let her know if you're

15  working late on Friday or on the weekend; do you see

16  that?

17      A.    Yes.

18      Q.    Did you receive these reminders every

19  Friday about accurate timekeeping and letting her

20  know about any exceptions to your timekeeping?

21      A.    Yes.

22      Q.    I'm going to go to the second page of that

23  exhibit, which is from 2020, the same thing; it's a

24  recurring reminder about submitting exceptions to

25  your time sheet, letting her know if you're working

1    late and then it says remind her if you're working

2    late, and it says, "Ultimately your time sheet is

3    your responsible," you see that?

4         A.    Yes.

5         Q.    Did you receive these from Ms. Fain --

6         A.    Yes.

7         Q.    -- calendar reminders about proper

8    timekeeping?

9         A.    Yes.

10        Q.    I'm going to keep scrolling down.  These

11   look like -- they look like they're duplicates, but

12   this is from 2021 that you received it every Friday?

13        A.    Yes.

14        Q.    This is 2020 that you received every

15   Friday starting at the beginning of the year.  These

16   are -- it looks like more duplicates.

17              So do you remember having these

18   discussions with Ms. Fain about accurate timekeeping

19   and reporting any exceptions or inaccuracies about

20   your time card to her on a weekly basis?

21        A.    Yes.

22        Q.    Did you talk about this in your team

23   meetings?

24        A.    Yes.

25        Q.    All right.  There's a note down here.

1  other than Terrie about your employment at Centene?

2       A.   No.  I don't remember --

3       Q.   You can't --

4            THE STENOGRAPHER:  I'm sorry.

5       Q.   -- going to --

6            THE STENOGRAPHER:  I'm sorry.  I didn't

7       hear the end.  You said, "No, I don't

8       remember," and then I didn't catch what you

9       said.

10      A.   I don't remember reporting it to anyone or

11 bringing it up to anyone.

12  BY MS. STORCH:

13      Q.   Okay.  And you said in one of your

14 interrogatories that you said you complained to the

15 Arkansas labor board.  What did you complain to the

16 Arkansas labor board about?

17      A.   After I was terminated, I felt like --

18 after coming back from my accommodations -- I felt

19 once my accommodations were over, that's when I

20 was -- that's when I was fired, so I did complain to

21 them about it.

22      Q.   What did you complain about?

23      A.   Just felt like -- what was the complaint?

24 More of the fact that I felt like maybe because I

25 was -- had to have accommodations, that I didn't get

1  a fair -- I didn't get fair treatment.

2      Q.   Did you ever complain about your pay to

3  the Arkansas labor board?

4      A.   No.

5      Q.   Did you ever complain about your hours at

6  the Arkansas labor board?

7      A.   No.  Not that I remember.  That was my

8  complaint to them.

9      Q.   It was the accommodation issue?

10     A.   If I remember correctly.

11     Q.   You also said that you said Terrie Fain

12 also told you that she didn't want you working off

13 the clock, correct?

14     A.   No, I didn't say that.

15     Q.   Okay.  I'm going to pull up your

16 interrogatory answers.

17     A.   I don't remember saying that.

18     Q.   I'm going to share my screen.  It's

19 Exhibit 26, Interrogatory Number 3.  So it says,

20 "Identify any claim, complaint, charge, grievance

21 concerning defendants, any complaint to defendants

22 concerning the subject matter of the lawsuit."

23         Okay.  So then after the objection, which

24 is the legal objection, you say, you tried to make a

25 complaint with the Arkansas labor board, but didn't

1        Q.    How did she communicate to you that you

2   needed to log off?

3        A.    She would call me or she would IM.

4        Q.    IM --

5        A.    On the computer.

6        Q.    -- on the computer?

7        A.    Uh-huh.

8        Q.    You said you know of one time that it

9   happened and there may have been other times.  What

10  are the specific days and times that that occurred?

11       A.    I don't have those dates and times.

12       Q.    How many times would you say that

13  occurred?

14       A.    A lot.

15       Q.    A lot, is that more than two?

16       A.    Three.

17       Q.    More than three.

18       A.    More than three.

19       Q.    Less than ten, less than five?

20       A.    I don't know.  It was a lot of times.  At

21  least three to seven.  Three to seven hours,

22  sometimes, a week over.

23       Q.    I'm saying how many times did she contact

24  you while you were working and tell you to log off?

25       A.    At least once a week, once or twice a

1  improvement plan, correct; is that why you were

2  terminated?

3       A.   Yes.

4       Q.   For failing to meet your metrics?

5       A.   Yes.

6       Q.   You never mentioned pay when you were

7  terminated; is that correct?

8       A.   No.

9       Q.   Did you ever --

10      A.   That's correct.

11      Q.   Okay.

12      A.   I didn't mention it.

13      Q.   You didn't mention it.  When you were put

14  on the three PIPs that we went over just a few

15  minutes ago, they -- at least one of them included

16  discussions about proper timekeeping, correct?

17      A.   Yes.  That's when the agenda was started

18  where I'd write down or -- in the system we could

19  write down -- you could document what you needed --

20  not document, but like set yourself a note of things

21  you needed to do for the next day and check those

22  off as you go -- that was part of my time

23  performance review -- and check off those things.

24           A lot of times that stuff didn't get

25  marked -- get done because if we had a meeting

1  2019 from May 2019 until COVID hit?

2       A.   At least two or three times a week.

3       Q.   A week?

4       A.   If I had -- say, like, I went to Alma and

5  then I went to -- even around this area, North

6  Little Rock or something, once I made it home, I

7  would document.  So maybe two or three times a week.

8       Q.   And you'd document that in the system, the

9  TruCare system?

10      A.   Yes.

11      Q.   Okay.  Any other occasions that you would

12  work after 5:00 p.m. besides those that you just

13  mentioned?

14      A.   If -- I remember one Sunday I had some --

15  I was like I need to finish this up before the new

16  week starts and I remember working on a Sunday one

17  time.

18      Q.   Okay.

19      A.   Trying to do --

20      Q.   Sorry.

21      A.   Trying to update a plan.

22      Q.   Did you clock in for that Sunday?

23      A.   No, just documented it.

24      Q.   Did you let your supervisor know you were

25  working that Sunday?

1        A.    No.

2        Q.    On the times where you came back from the

3   members' houses and documented because you didn't

4   have internet access, did you let your supervisor

5   know you were documenting after you got home?

6        A.    If it was approved -- an approved time.

7        Q.    Say that one more time.

8        A.    If it was an approved over -- like,

9   overtime, then I would.  If I let her know ahead of

10  time that I was going to be over my hours, then I

11  would let her know.

12       Q.    You would clock in -- or stay clocked in?

13       A.    Stay clocked in.

14       Q.    Otherwise, you didn't let her know?

15       A.    I didn't let her know --

16       Q.    Okay.

17       A.    -- if I didn't get it approved.

18            MS. STORCH:  Okay.  I know you need a

19       break, so I'm going to mark that and we'll just

20       continue where I'm leaving off right now after

21       the break.  How long do you need?

22            THE WITNESS:  A good ten minutes.

23            MS. STORCH:  Okay.  So it's 1:01.  You

24       want to give us 1:15?  That will give a little

25       bit of extra time.

1       Q.   You see at the top it says period

2    beginning 5/12/2019, do you see that?

3       A.   Uh-huh.

4       Q.   All right.  It's 50 pages, but I'm happy

5    to scroll through.  If you have a computer, you have

6    access to these exhibits.  It might be easier for

7    you to see them that way.  But I'm happy to keep

8    doing what we're doing if that works for you.

9       A.   This works.

10      Q.   Okay.  All right.  So these are the pay

11   stubs.  I will scroll through.  If you want me to

12   slow down, just let me know.

13      A.   Can you slow down a little bit?

14      Q.   Okay.  Sorry.  Yeah.  All right.  Were

15   your pay stubs an accurate statement of what was

16   paid to you?

17      A.   What was paid, yes.

18      Q.   And is it an accurate statement of the

19   hours that you worked on these pay stubs?

20      A.   No.

21      Q.   Okay.  When you got your pay stubs, did

22   you review them to make sure they were accurate?

23      A.   Yes.

24      Q.   Okay.  And did you ever find discrepancies

25   with your pay stubs?

1      A.   I don't remember, but I don't think so,

2   though.

3           (Thereupon, the time records were marked

4       as Defense 35.)

5     BY MS. STORCH:

6      Q.   All right.  I'm going to introduce another

7   exhibit, which are your time records.  This is going

8   to be Exhibit 35.

9           Okay.  This is another Excel spreadsheet,

10  but I'll try to scroll over.  I haven't fully

11  figured out how to make it bigger.  Okay.  Let me

12  share my screen.

13          All righty.  Can you see the spreadsheet?

14  It's your timecards from May 13th, 2019, and I will

15  scroll down to the end, which is March 2021 at the

16  end.  You see those?

17     A.   Uh-huh.

18     Q.   Okay.  This is so -- are these time

19  records accurate when you clocked in and out?

20     A.   Yes.

21     Q.   Okay.  And you were able to edit your own

22  time; is that correct?

23     A.   I think so, yes.

24          (Thereupon, the time edits were marked as

25      Defense 36.)

1    BY MS. STORCH:

2       Q.   I'm going to introduce Exhibit 36, which

3    is time edits.  Okay.  You see the edits for this --

4    this is for the time period May 2019 to March of

5    2021, there -- it shows when you clocked in, if

6    someone changed it.  The user entered is when

7    someone has modified the time, the clock post looks

8    like when you were clocking in.  And, of course, I'm

9    not sharing my screen.  So thank you.  I forget to

10   hit that last button.

11           Okay.  So these are the time edit records

12   for the May 2019 to March 2021.  So there were

13   numerous times you missed punches and you let your

14   supervisor know that she needed to make edits,

15   correct?

16      A.   Uh-huh.  Or let her know that I was going

17   change -- what I was doing.

18      Q.   So if you let her know that you needed to

19   make an edit and what the edit needed to be, she

20   could make that edit for you, correct?

21      A.   Or she knew that I was making it.

22      Q.   So you could edit your time to make sure

23   it was accurate, correct?

24      A.   Uh-huh.  I would have to let her know.

25      Q.   Are you aware of any time your supervisor

1    changed your time without your permission?

2         A.   Well, she -- I don't recall.

3         Q.   So you're not aware of any time she did?

4         A.   No.

5         Q.   Okay.  Are you aware of any time your

6    supervisor made any changes that were different than

7    the information you provided to her about the

8    changes that needed to be made?

9         A.   No.

10        Q.   Okay.  So the user in Column D, that has

11   the employee number, correct?

12        A.   Yes.

13        Q.   You see that.  You're 250021, correct?

14        A.   Yes.

15        Q.   Okay.  I can let you know that Terrie Fain

16   was 265742, because that was in the HRIS records,

17   and then Christy Kelly is 247736.  So like, for

18   example, here Christy Kelly was, it looks like,

19   updating time for 5/17, which is right here.  You

20   clocked in and then it looks like you either forgot

21   to clock in or forgot to clock out for lunch and so

22   she was able to update that, do you see that?

23        A.   Yes.  Like when I got ready to clock out

24   for lunch, it didn't take and so that's when I asked

25   her --

1      Q.   So she was able to correct it?

2      A.   Uh-huh.

3      Q.   Okay.  The user entered indicates that

4   someone is manually doing that, correct?

5      A.   Correct.

6      Q.   On 5/15, for example -- all right.  You

7   clocked in at 10:08 a.m., it looks like from the

8   clock post, and then it looks like Ms. Kelly said

9   you clocked in at 8:00 a.m. to correct that,

10  correct?

11     A.   Correct.

12     Q.   So she was actually adding time because

13  you had made a mistake when you clocked in?

14     A.   Yeah.  I let her know, Hey, this -- yeah.

15     Q.   Why would you clock in at 10:08 instead of

16  8:00 if you were working at 8:00?

17     A.   At 10:08, I don't know why it's like that.

18     Q.   Okay.

19     A.   I don't know.  It's a long time ago.

20     Q.   All right.  So, again, on 5/17, it's just

21  an example of being able to modify.

22     A.   Yeah.  We were in close proximity to each

23  other as well, so it could have been, Hey, you

24  didn't get here at this time.  Maybe I was going to

25  take a lunch -- I don't know how -- I really don't.

1      Q.    So in this particular case on 5/17, it

2    looks like there was a user, which was your

3    supervisor, was doing some -- it looks like you

4    clocked out at 5:00, but hadn't clocked in, so it

5    looks like she went in and corrected that, added a

6    clock-in time, a lunch time and then a clock-out

7    time; does that look accurate to you?

8      A.    Yeah.

9            (Thereupon, the TruCare records were

10           marked as Defense 37.)

11    BY MS. STORCH:

12     Q.    Okay.  All right.  So I'm going to

13    introduce another exhibit, which are TruCare records

14    for you and this should be Exhibit 36 -- 37, I'm

15    sorry.  I'll share my screen.

16           So the TruCare notes -- I think we were

17    talking about this system earlier, about how you

18    logged everything you did on behalf of members,

19    correct?

20     A.    Yes.

21     Q.    Like D is schedule face-to-face or have a

22    face-to-face.  So these dates are in 2019.  I'm

23    going to scroll up to the beginning.  So it starts

24    May of 2019, do you see that line right there?  It

25    looks like, for example, you did an outbound call,

Page 128

1        A.    Yes.

2        Q.    What type of accommodations, do you

3    recall?

4        A.    Time off if I needed it off.  If I needed

5    to clock in at a later time due to my illness, that

6    I could clock in.  If I needed to clock out, that I

7    could clock out.

8        Q.    Anything else?

9        A.    And then I think it was something like --

10   I'm not really sure.  I can't remember the

11   paperwork.  Where if I needed a day -- maybe I

12   wasn't full -- I don't remember if I was back full

13   40 hours.  I can't remember.

14           (Thereupon, the accommodation paperwork

15       was marked as Defense 39.)

16    BY MS. STORCH:

17       Q.    Okay.  So I'm going to show you your leave

18   paperwork -- or your accommodation paperwork, I'm

19   sorry.  Maybe this will -- we can talk about what it

20   says.  So this looks like it was in July of 2020

21   when this was approved, correct?

22       A.    Yes.

23       Q.    So you had a continuous leave through 7/6

24   it looks like, correct?

25       A.    Yes.

Page 129

1       Q.    And then they approved you for

2   intermittent leave unscheduled, which was up to four

3   days per month, correct?

4       A.    Uh-huh.

5       Q.    And then it looks like it's in place from

6   7/7/2020 until 1/7/2021, does that look correct?

7       A.    Yes.

8       Q.    And you were just supposed to report if

9   you were going to be out for your intermittent leave

10  and your job was modified at this point.  And they

11  reduced your caseload from 50 cases a month to 35

12  cases a month, do you see that?

13      A.    Yes.

14      Q.    So that was in place, too, in July.  That

15  modification was in place from 10/23 -- I'm sorry,

16  until 10/23/2020, to be reevaluated at that time.

17  And then in addition to the reduced caseload, you

18  also had a break schedule.  Can you tell me about

19  the break schedule that was in place that's noted

20  here?

21      A.    If needed, I could use those break

22  schedules to -- during the daytime.  So for a 15

23  break -- I think, it's 15 minutes, I didn't have to

24  clock out, so they broke it up into those.

25      Q.    Okay.  So you didn't clock out for any of

1    these breaks that you took, they were just kind

2    throughout the day, intermittently?

3        A.    If I needed, yes.

4        Q.    What would dictate whether you needed a

5    break?

6        A.    If I had a flare-up of some sort.

7        Q.    What does a flare-up mean?

8        A.    From my illness.

9        Q.    What was your illness specifically?

10       A.    I had a stroke.

11       Q.    Okay.

12       A.    And -- I had COVID and then I had a stroke

13   a few days later.  After getting better from COVID,

14   I had a stroke.

15       Q.    Okay.

16       A.    So caused me to have some anxiety.  So if

17   I were feeling anxious, then I would -- I was -- I

18   was -- with the accommodations, I could take a

19   break.

20       Q.    Okay.  And did your doctor talk about,

21   like, your work schedule?  I know you could have a

22   day, an average of a day week, so four days a month

23   to be out on intermittent leave if you needed it,

24   correct?

25       A.    I believe so, yes.

1          Q.   Okay.  Did -- could you -- it looks like

2    you had to take breaks during the day if you needed

3    them or were supposed to or could, does that mean

4    you were extra tired during the day?  What drove

5    whether you would take a break or not?

6          A.   I was extra tired sometimes.  I was still

7    sick, so, like, still in pain, things like that.

8    Medications sometimes would have me where I couldn't

9    work a full day.

10         Q.   Okay.

11         A.   Or need to take a break during that time.

12         Q.   Is that why they gave you a reduced

13   caseload because you couldn't work as much?

14         A.   Right.  Yes.

15         Q.   So if you had 50 cases a month and they

16   reduced your caseload by 30 percent, because you had

17   15 less cases than you had before, correct?

18         A.   Correct.

19         Q.   All right.  So you could work from home,

20   but it sounds like that was already in place because

21   COVID was upon us, correct?

22         A.   Uh-huh.  Yes.

23         Q.   And then you got a noise-canceling

24   headset.  Are there any other accommodations that

25   were discussed during this particular time frame?

1      Q.   So when you were -- when you got the

2   accommodation -- it looks like it was renewed again.

3   Do you remember that, when you went through the

4   renewal process for the accommodation?

5      A.   Yes.

6      Q.   Okay.

7      A.   I --

8           THE STENOGRAPHER:  I'm sorry.  What did

9      you say, ma'am?

10     A.   I said I vaguely remember it, but I know I

11  had accommodations for a while.  For a while.

12    BY MS. STORCH:

13     Q.   All right.  So on this document, it's --

14  the accommodations are in place 7/23/2020 to 2021

15  for the work from home through 1/7/2021 for the

16  flexible schedule, which you can adjust your

17  schedule and flex it no more than five hours a week.

18  And then the accommodation for the breaks is in

19  place through January 2021, and then the reduced

20  caseload from -- until 10/23/20 and reevaluate it at

21  that time, you see that?

22     A.   Yes.

23     Q.   And then it looks like it was discussed

24  again and your 35 caseload continued, correct, in

25  conversations with your supervisor?

1      A.   I think it increased by then.  I'm not

2  sure, but I think it did.  I don't remember.

3      Q.   You don't remember.  Okay.  So this is

4  another accommodation letter for you, which says,

5  the leave accommodation is still in place from

6  January 8th to July 6th, 2021, which is up to five

7  days instead of four days each calendar month for

8  the flare-ups, do you see that?

9      A.   Yeah.  I had more doctor appointments.  I

10  can remember having more doctor appointments in

11  that, yes.

12      Q.   Okay.  Did you take those five days

13  generally or the four days per month of intermittent

14  leave that were available to you?

15      A.   Yes.

16      Q.   Okay.  Then you had another -- a modified

17  break schedule that added a break from 4:00 to 4:10,

18  do you see that?

19      A.   Yes.

20      Q.   There's one, two, three, four breaks

21  instead of the three, and lunch, and that

22  accommodation was in place until 7/6/2021 and then

23  you had the flow charts and laminated items,

24  correct?

25      A.   Correct, yes.

1      A.   Yes.

2      Q.   During the time of your accommodation,

3  which started in July of '20, is it accurate that

4  you weren't working after you clocked out?

5      A.   No, if I was -- if -- after I clocked out?

6      Q.   Yeah.

7      A.   Repeat.

8      Q.   I'm not saying that you didn't work past

9  5:00, because you did work past 5:00 on some of

10 those days.  But you clocked out and you didn't

11 continue working after your accommodations started;

12 is that accurate?

13     A.   I clocked out and I didn't continue

14 working.

15     Q.   So after your accommodation started in

16 July 2020, once you clocked out for the day, you

17 didn't continue working, correct?

18     A.   Sometimes I did.

19     Q.   On what occasions would you do that?

20     A.   If I felt like I had gotten behind.

21     Q.   How many times would you say you did that?

22     A.   Maybe once or twice a week.

23     Q.   One to two times a week when you were

24 being accommodated with a reduced schedule and extra

25 breaks?

1     A.    Scared of my losing my job.

2     Q.    But your supervisor didn't know that you

3 were continuing to work, correct?

4     A.    No; and when she did, she would ask me to

5 log off.

6     Q.    Okay.  What made you afraid of losing your

7 job if your accommodations were in place and you

8 weren't -- you know, you had a modified schedule, et

9 cetera?

10     A.   I had been off so long, you know, from

11 being sick, I was just worried -- I always worried

12 about my job.  I wanted to kind of prove myself that

13 I could do the -- still do the job.

14     Q.   Were you able to keep up with the reduced

15 caseload of 35 cases per week -- I mean, per

16 month -- I'm sorry, 35 case members, I guess, that

17 would be a caseload, correct?

18     A.   Yes.  But I had to work extra hard, the

19 brain takes longer to heal.  You know, I had to

20 realize that it, so it took me longer to do things.

21     Q.   Okay.  I'm going to show you your pay

22 stubs.  These are your pay stubs that we've seen

23 before, which is Exhibit 34, and I'm going to scroll

24 through and you can see right -- I'll show you --

25 like in this line, it says overtime 2.5 hours, do

1    you see that?  Can you see?  Is that big enough?

2        A.   Yes.

3        Q.   Okay.  So if I scroll through all of these

4    pay stubs, which is from the middle of April 2019 to

5    the end of your employment, it looks like you were

6    paid overtime in almost every -- in about 26 of the

7    pay periods.  Do you see that?

8              I'll keep scrolling, so here's another

9    overtime.  Page 8 has overtime.  Page 9 has

10   overtime.  Page 10 has overtime.  Eleven has

11   overtime.  Twelve has overtime.  Thirteen has

12   overtime.  Fourteen has overtime.

13             This has holiday pay and vacation pay,

14   this pay stub, so it looks like there's no overtime

15   there.  This pay stub has overtime.  That paystub

16   has overtime.  That paystub has overtime.  The pay

17   stub before that had sick time of 12 hours, so it

18   has no overtime, that one.  This pay stub has

19   overtime.  This pay stub has overtime.  This pay

20   stub has overtime.  This pay stub has overtime.

21             Then it looks like you were on

22   holiday/sick vacation and leave so you were not

23   getting any hours for these times.  And then you're

24   back and right when you came back, you had some

25   overtime.

1            Again, the next week you had overtime.

2    And then you were only working 71 hours, 70 hours,

3    holiday time, so you didn't have overtime that pay

4    period.  Overtime in September of 2020, and then

5    again in October, vacation on this time period and

6    then vacation and holiday, must have been the

7    holidays, that was Thanksgiving and overtime in this

8    pay period in December and then no time -- that's

9    the end of the year.  And then holiday time in this

10    one.

11            More overtime in January 2021, you had

12    some sick and holiday time then, and then more sick

13    time and vacation time, regular time.  And so that

14    was all the pay stubs that we have.

15            Would you agree that you had overtime in

16    26 -- or a majority of the pay periods in May 2019

17    to March 2021 time frame?

18        A.    Yes.

19        Q.    All right.  We're going to look at the

20    TruCare records again.  All right.  For the TruCare,

21    you said that you would -- where did you do the

22    documentation?  What device did you use for TruCare?

23        A.    Chromebook.

24        Q.    Okay.  All right.  So the TruCare activity

25    show all the contacts with the members, correct?

1     A.   Yes.

2     Q.   So you were saving the time on the drive

3  and the meeting with the members in person.  What

4  were the extra responsibilities you had after COVID

5  hit?

6     A.   A lot of calling.  A lot of calling.  A

7  lot of -- had a lot of special projects.

8     Q.   Okay.  Is that the special project that

9  you described to me, that DHS?

10     A.   That, and finding resources for members,

11  kids are home, no food, finding -- locating,

12  verifying those resources were accurate so members

13  could actually use them.  It takes -- that's

14  time-consuming.

15     Q.   So COVID hit in March 2020 and then you

16  worked for that month and then for some of April and

17  then went on leave.  So you were gone some of April,

18  May, June and then you were back in July and then

19  you had a reduced caseload, correct?

20     A.   Yeah.

21     Q.   So with that reduced caseload, wouldn't

22  that make your necessity to work -- wouldn't that

23  reduce your hours needed to work because you had 35

24  cases -- or members?

25     A.   After having a stroke, you're not able to

1    Okay.

2              How did you learn about the lawsuit

3    against Centene?

4         A.    When I called -- when I called the -- what

5    do you call it?  Not Better Business Bureau.  When I

6    called about my -- who did I call?  You mentioned it

7    earlier.  I can't remember right now.  The labor

8    board.  When I had called the Department of Labor,

9    they suggested that I call.

10        Q.    Who?

11        A.    Sanford Law Firm.

12        Q.    The Labor Board suggested that?

13        A.    Yeah.  They said there were already --

14   once I called and I was expressing what happened,

15   they told me that there were already cases out for

16   Centene and I was shocked.  And then I -- to find

17   that out.  And then that's when they told me that

18   there were other open cases.

19        Q.    They told you to call the Sanford Law

20   Firm?

21        A.    They didn't tell me to.  They told me that

22   that's what other people had done.

23        Q.    Okay.  And have you ever seen a video on

24   your attorney's website about Centene?

25        A.    No.  But I have been on the website.  I

1   that would put me -- that would be a time where I

2   couldn't say, Hey, I'm having to work a little over.

3       Q.   Okay.  So you would just stay clocked in

4   or clock your time and get paid for that, correct,

5   in those circumstances?

6       A.   Sometimes.

7       Q.   Did you communicate with anyone during

8   your breaks today?

9       A.   No.

10      Q.   Okay.  Did anyone come into your house

11  when you were giving your deposition testimony?

12      A.   No.  A butterfly.  That's it.

13      Q.   I don't think the butterfly really cares

14  about the deposition.  All right.

15           Do you have any documentation regarding --

16  whether it's like a calendar entry or scrap of piece

17  of paper or anything of that nature, do you have

18  anything where you kept track of any time that you

19  are saying that you worked when you weren't clocked

20  in?

21      A.   Unfortunately, I threw all that away, so,

22  no.

23      Q.   What was it that you had?

24      A.   Just times that I knew I had worked over,

25  but I just didn't let her know.

1      Q.    Okay.  How did you keep track of that?

2      A.    Just had a legal pad, I kept everything on

3  there.

4      Q.    When did you throw that away?

5      A.    Had to have been -- I don't remember when

6  I threw it away.  I don't remember.

7      Q.    Okay.

8      A.    But at some point when I was throwing away

9  those -- because I had everything -- I had to have

10  everything secure because it was PHI.  So maybe when

11  I threw that I way, I probably accidentally threw it

12  away.

13      Q.    Was it more than a year ago that you threw

14  it away?

15      A.    It was more than a year ago, yes.

16      Q.    How long after your employment ended did

17  you throw it away?

18      A.    When I hadn't heard anything else about

19  the case, I threw it away.

20      Q.    Say that one more time.

21      A.    When I hadn't heard anything else about

22  this case, then I threw it away.  I didn't think

23  anything was going to come of it, so I threw it

24  away.

25      Q.    Was it after you signed your consent form

1  to join the lawsuit?

2       A.    Yes.   That would have been -- yeah.   Had a

3  new job and just kind of thought it -- nothing was

4  going to happen from it, so threw it away.

5              (Thereupon, the consent was marked as

6       Defense 43.)

7    BY MS. STORCH:

8       Q.    Okay.   So I'm going to look -- you signed

9  your consent form to join this lawsuit -- I'm going

10 to pull it up now so you can see it as Exhibit 43.

11 I'm going to screen share.

12              Can you see that?   Does it say "consent to

13 join collective action"?

14       A.    December 2022.   Yeah.   So I started

15 working in -- after I started working somewhere

16 else, I called before I -- before I started working,

17 I called to see if anything was going on with the

18 case, and I was told no.

19              MR. SHORT:   Hold on.

20       A.    So I just --

21    BY MS. STORCH:

22       Q.    You don't tell me what you talked about --

23 sorry -- with your attorneys.   That's -- you don't

24 have to tell me what you talked about.   I'm just

25 curious in -- when did you start your other job?

Page 182

1                     CERTIFICATE OF REPORTER

2

3     STATE OF FLORIDA

4     COUNTY OF BROWARD

5

6               I, DAWN SCOTT, Stenographer, do hereby

7     certify that I was authorized to and did

8     stenographically report the foregoing Zoom

9     videotaped deposition of TIFFANY RUSSELL; pages 1

10    through 182; that a review of the transcript was not

11    requested; and that the transcript is a true record

12    of my stenographic notes.

13               I FURTHER CERTIFY that I am not a

14    relative, employee, attorney, or counsel of any of

15    the parties, nor am I a relative or employee of any

16    of the parties' attorneys or counsel connected with

17    the action, nor am I financially interested in the

18    action.

19               Dated this 3rd day of April, 2024.

20

21

22

23

24    _____

25               DAWN SCOTT, STENOGRAPHER